IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| MEGHAN MOULTON, KIANA RIVERS, STEPHANIE GRIFFIN, and VICTORIA SEARCY, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:18-cv-67-ALB |
| v. | ) ) ) | |
| W.W.I., INC., d/b/a THINGS & WINGS RESTAURANTS, and WILLIAM W. INGRAM, | ) ) ) ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION AND ORDER**

This matter comes before the court on Plaintiffs Meghan Moulton, Kiana Rivers, Stephanie Griffin, and Victoria Searcy's (the "employees") motion for partial summary judgment. (Doc. 27). Upon consideration, the motion is GRANTED.

### BACKGROUND

Defendants W.W.I., Inc. and William W. Ingram (the "employers") operate three restaurants in Dothan, which they refer to as the North, South, and West side stores. (Doc 26-1 at 5). Ingram is the "sole owner" of W.W.I., Inc., although there was also an employee shareholder while the employees worked for him. (Doc. 26-1

at 5). Ingram was "the individual that turned the hours worked in to an outside payroll service called Apex." (Doc. 26-1 at 7).

Upon hiring a new server, the employers would tell the servers that they would be paid $2.15 per hour, "[a]nd the tips that they earn will be reported" because the employers planned to take a "tip credit." (Doc. 26-1 at 41). Ingram decided to pay $2.15 rather than the $2.13 required by FLSA because he "wasn't going to fool with the two cents." (Doc. 26-1 at 20).

The employees allege that the employers deducted uniforms, customers' beverages, and missing silverware from their base wage, which improperly lowered their wage beneath the $2.13 required by FLSA. (Doc. 27 at 4, 8). The employees are charged for their initial uniforms, three shirts and two aprons, and any replacements. (Doc. 26-1 at 25). Ingram acknowledged that both the initial and replacement uniform purchases were deducted from their pay. (Doc. 26-1 at 25). The employers require the servers to put what beverage each customer is drinking at the top of the ticket. (Doc. 26-1 at 17). The employers notified the employees that if they failed to do so, the employers would take the beverages out of their individual paychecks. (at 17). But the employees could be reimbursed the $2.50 drink deduction per customer if they remembered the table drank. (Doc. 26-1 at 19). In hindsight, Ingram said that "[t]he right choice probably would've been just to terminate them," but they were having trouble keeping servers. (Doc. 26-1 at 18).

As for the silverware, Ingram said he "might" have heard about such deductions, but he would be surprised to learn that it had occurred at his restaurants. (Doc. 26-1 at 22–24).

When confronted with the employees' allegations, Ingram repeatedly acknowledged the illegality of his conduct: "Q. You take their beverage money away from them, which is illegal if you're [sic] counsel hasn't advised you already. A. Yeah. I'm just trying to change behavior, trying to get them to charge for it. They have bad habits." (Doc. 26-1 at 37). And again:

> "Q. So the money is coming out of somewhere, and the only other money you're paying them is the 2.15 per hour subminimum wage rate, right? A. Yeah. Q. So it's coming out of that? A. Yeah. It has to. It's the only thing left. [(Doc. 26-1 at 41)]
>
> "Q. And did Bailey, when she was training individuals, tell them that it was illegal for you-all to put them below the minimum wage -- A. Yes. Q.-- and to deduct from that 2.15 per hour? A. Yes. Q. So you-guys knew what you were doing was illegal? A. Which part? Q. Deducting the beverages from the 2.15 per hour rate. A. I don't think that thought process entered our minds that it was illegal. We were just trying to change their behavior. Q. Well, you -- A. I don't think that was a conscious thought."

(Doc. 26-1 at 42). And a third time:

> "Q. But if it was to get bad again and it would be economically feasible, you would reinstitute the policy? A. No, not after this meeting. Q. Why? A. Because you just told me it was illegal. We would … write them up, take disciplinary action against them or coach them and counsel them how to avoid it, advise their supervisor to check behind them."

(Doc. 26-1 at 42).

3

In their briefing, neither party provided much support for their respective positions. The employers provided an employee manual, but later acknowledged that it was not the correct edition. (Doc. 26-1 at 25). And due to a hard drive crash, the data for the North side store was lost. (Doc. 26-1 at 15). The status of the other stores' data is unclear. Ingram remembered attempting to recover the employees' data from the south and west side stores, but he could not remember whether he was successful. (Doc. 26-1 at 15). Later, Ingram said he "honestly, truthfully can't recall trying to search for" the west side's data. (Doc. 26-1 at 44). But he also said, "I could contact Apex and have them print me up beverage charges through their software. They could print me a report on uniforms that was deducted from the individuals." (Doc. 26-1 at 18).

Aside from the computer failure, it seems that the employers' recordkeeping left something to be desired, not even tracking their employees' cash tips: "Q. Do you know what the average tips are for cash or is that not -- do you track that? A. No, we don't track that. I have no way of telling." (Doc. 26-1 at 44).

Ingram's plan to make up for the missing evidence about the hours worked was "[w]itnesses. These four plaintiffs are the only persons that I am aware of that ever had a complaint in the 26-year history of our company. And I can talk to my present employees I've got and the ones from the past …." (Doc. 26-1 at 37). Ingram guessed that interviewing these witnesses would show "very few complaints or

problems." (Doc. 26-1 at 37). So, Ingram proposed using "other people's testimony and other people's information and … information I'm aware that I can get from Apex." (Doc. 26-1 at 38).

The employers, however, were ultimately able to provide payroll information from Apex. Griffin worked 29 hours 53 minutes of overtime, Rivers 0 hours 0 minutes, Searcy 5 hours 30 minutes, and Moulton 12 hours 9 minutes.[1] (Doc. 29 at 11, 17, 20, 26). The payroll information also shows "miscellaneous pay" and beverage and uniform deductions. Griffin received $60.74 in miscellaneous pay, Rivers $0.00 Searcy $92.00, and Moulton $118.00. (Doc. 29 at 11, 17, 20, 26). Griffin's beverage deductions were $61.00, Rivers $34.50, Searcy $67.50, and Moulton $50.50. (Doc. 29 at 11, 17, 20, 26). Griffin's uniform deductions were $22.00, Rivers $49.00, Searcy $45.00, and Moulton $56.00. (Doc. 29 at 11, 17, 20, 26).

"Miscellaneous pay" was given either for error correction or to avoid paying for overtime work by allowing the employees to work off-the-clock. (Doc. 26-1 at 11).

---

[1] The employers included a chart in their response brief, but discrepancies exist with the reports provided. It appears the employers may have added the hours incorrectly. While an understandable error—most lawyers enter law to avoid math—it is an error nonetheless.

For example, the employers said Victoria Searcy had worked 4.90 hours overtime. On her timesheet, her total overtime was 5:30 (5 hours 30 minutes). One week, Searcy worked 1:40 overtime, and another week she worked 3:50 overtime. Adding these together would be 4:90, which is the number the employers supplied. But this would be 4 hours 90 minutes, or 5.5 hours, not 4.9 hours.

"Q. And so why would you make them not work the shift? A. Because of the overtime pay. It's just—it's almost an industry standard in not letting servers work their overtime pay. Q. Yeah. But you're letting them work. You're not just not letting the hours accrue. A. That's correct. Q. And that makes it better to you? That makes it legal to you? A. I don't know. I'm not a lawyer. That's just between the server and the … supervisor."

(Doc. 26-1 at 11–12). When the employees worked for "miscellaneous pay," the employers paid them just $5.00 plus tips. (Doc. 26-1 at 10). Ingram said "I don't think [Griffin's miscellaneous pay] was for overtime. [The supervisor] might have reimbursed her for … some of her beverage expenses." (Doc. 26-1 at 45). But Ingram admitted he did not actually know what it was for. (Doc. 26-1 at 45). And Ingram said Searcy and Moulton's miscellaneous pay was "probably" for overtime. (Doc. 26-1 at 45).

The employees now seek partial summary judgment that (1) they were not paid minimum wages, (2) they were denied overtime compensation, and (3) Ingram was their employer under FLSA.

## STANDARD

The court will grant summary judgment when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc). The moving party need not produce evidence disproving the opponent's claim; instead, the moving party must demonstrate the absence of any genuine issue of material fact.

6

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In turn, the nonmoving party must go beyond mere allegations to offer specific facts showing a genuine issue for trial exists. *Id.* at 324. When no genuine issue of material fact exists, the court determines whether the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## DISCUSSION

The issues presented in the motion and response are whether Ingram was the employees' "employer" under FLSA and whether the employees received proper minimum wage and overtime compensation. The employees claim that Ingram was their employer because he "was an officer and owner of W.W.I., Inc., controlling its day-to-day operations and finances, as well as matters in relation to [the employees] and their compensation." (Doc. 27 at 10). The employers declined to respond to this allegation.

The employees also allege that they were not paid minimum wage because Defendants deducted uniforms, customers' beverages, and missing silverware from their paychecks. Ingram admits to the uniform and beverage deductions but claims ignorance as to the silverware deductions.

The employers allege that the employees' estimate of uncompensated overtime is unsubstantiated and speculative, so there is no burden shift requiring the employers to show the precise amount of work performed. The employers note that

the employees are responsible for clocking into and out of the system; the records of which are turned over to a third party. The employees are paid slightly above minimum wage at $2.15 with overtime at $5.78, the difference being made up by tips. The employers then assert that because the employees did not keep track of their cash tips, there is no way to determine whether their total compensation fell below the minimum and overtime wage thresholds, so their claim must fail.

The employers fail to address the employees' allegations by focusing on the tip credit without addressing the underlying base minimum wage violations. The court finds that the employees should be granted summary judgment on the minimum wage and overtime violations and that Ingram was their employer.

### I. Ingram was Plaintiffs' Employer Under FLSA

The employees contend that Ingram was their employer under FLSA because he "was an officer and owner of W.W.I., Inc., control[ed] its day-to-day operations and finances, as well as matters in relation to [the employees] and their compensation." (Doc. 27 at 10). The employers do not contest this issue.

To determine whether a person is an employer under FLSA, the court considers the facts of the case "in light of the 'economic reality' of the relationship between the parties." *Villarreal v. Woodham*, 113 F.3d 202, 205 (11th Cir. 1997) (quoting *Goldberg v. Whitaker House Co-op., Inc.*, 366 U.S. 28, 33 (1961)). "The economic reality test includes inquiries into: whether the alleged employer (1) had

the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Villareal v. Woodham*, 113 F.3d 202, 205 (11th Cir. 1997) (quoting *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983)).

Here, Ingram stated that he is the "sole owner" of W.W.I., Inc., although there was an employee shareholder at the time the employees worked for him. (Doc. 26-1 at 5). The structure of the business is that the employees report to their supervisor, who reports to a head supervisor, who reports to Ingram. (Doc. 26-1 at 6). Ingram determined the pay rate, noting that he paid $2.15 instead of $2.13, because he "wasn't going to fool with the two cents." (Doc. 26-1 at 20). And Ingram "turned the hours worked in to an outside payroll service called Apex." (Doc. 26-1 at 7). Ingram does not dispute that he was the employees' employer, and the law supports holding Ingram to be the employees' employer under FLSA.

## II. Not Paid Minimum Wage

Ingram more-or-less admitted in his deposition testimony that his deductions from the employees' base pay were illegal. Under FLSA, an employer may pay its employees below minimum wage so long as the difference is made up in tips. 29 U.S.C. §203(m)(2)(A). It is the employer's duty to show it qualifies for this "tip

9

credit." *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 467 (5th Cir. 1979).[2] The base wage of $2.13 must be paid "free and clear." 29 C.F.R. § 531.35. No part of the employee's wage may "kick[]-back directly or indirectly to the employer or to another person for the employer's benefit…." 29 C.F.R. § 531.35. For example, if an employee must provide their own tools, there is a FLSA violation when the employee's purchase of necessary tools "cuts into the minimum or overtime wages required to be paid him under the Act." 29 C.F.R. § 531.35.

Here, the briefs discuss two types of FLSA violations: failing to pay the base minimum wage and failing to make up the tip credit in actual tips. The employers' response is focused on the latter violation—which the employees do not appear to be raising—that if the employees cannot show how much cash tips they made, they cannot determine whether their total compensation fell below the minimum wage threshold. Total compensation, however, is completely irrelevant to determining whether the employees received their base $2.13 wage. An employee could earn hundreds of dollars in tips, but a FLSA violation still occurs if the employer does not pay that employee the $2.13 hourly wage he owes her. *See P&K Rest. Enter., LLC v. Jackson*, 758 F. App'x 844, 848 (11th Cir. 2019) (per curiam) (noting that "employer must pay a tipped employee at least $2.13 per hour, regardless of how

---

[2] The Eleventh Circuit has adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

10

much money the employee earns in tips"); 29 U.S.C. § 203(m); 29 C.F.R. § 516.28(a)(3). Had the employees' tips not at least equaled the employers' tip credit, the employers would have committed a FLSA violation. But resolving that issue is not necessary to finding a FLSA violation on what the employees are actually alleging.

The employees allege that the employers' deductions brought their base wages below minimum. The employers told each employee that he or she would be paid at $2.15 because the employer planned to take a tip credit. (Doc. 26-1 at 41). This gave the employers a $0.02/hr buffer for deductions. Looking only at the beverage and uniform deductions, and laying aside the disputed silverware deductions, the employers' deductions repeatedly brought the employees' base wage below the minimum wage threshold. Ingram repeatedly acknowledged this conduct:

> Q. You take their beverage money away from them, which is illegal …
> A. Yeah
> …
> [Q.] the only other money you're paying them is the 2.15 per hour subminimum wage rate, right?
> A. Yeah.
> Q. So it's coming out of that?
> A. Yeah. It has to. It's the only thing left.
> …
> [Q.] you would reinstitute the policy?
> A. No, not after this meeting.
> Q. Why?
> A. Because you just told me it was illegal.

(Doc. 26-1 at 37, 41–42). Ingram's only excuse was it never "entered our minds that it was illegal." (Doc. 26-1 at 42).

With only a $0.02 buffer between the absolute minimum wage and what the employers were paying, even a $1.00 deduction would require fifty hours of work to avoid paying below minimum wage. The deductions that the employees address in their brief, and that the employers fail to address, were a FLSA violation. Summary judgment is due to be granted on this issue.

### III. Denied Overtime Compensation

The employees' alleged overtime violation is quite similar to the minimum wage violation. The required overtime wage for the employees was $5.78,[3] with a $5.10 tip credit that the employers would have had to pay if the employees did not receive at least that amount in tips. The employers renew their objection that the employees' allegations are unsubstantiated and speculative. The evidence shows otherwise.

---

[3] Overtime pay rate is not calculated by simply multiplying the employee's general pay rate by 1.5, which would result in too large of a tip credit. The employer's permissible tip credit is the difference between the general minimum wage and the tipped employee's base wage. *See, e.g.*, *Ventura v. Bebo Foods, Inc.*, 738 F. Supp. 2d 8, 16 n.1 (D.D.C. 2010). Here, the employees are paid at $2.15, so $7.25 – $2.15 = $5.10 tip credit.

To calculate the general overtime pay rate for tipped employees, multiply by 1.5 the general minimum wage (not the tipped minimum wage): $7.25/hr x 1.5 = $10.88/hr. *See, e.g.*, *id.* The employer's permissible tip credit is then subtracted from the general overtime rate: $10.88/hr - $5.10/hr = $5.78/hr. *See, e.g.*, *id.*

The tip credit's legality is also still dependent on actually being offset by the employee's tips received during overtime work. *See, e.g.*, *id.*

When the employees officially worked overtime, the employers paid them the required $5.78 hourly. But in an attempt to avoid paying for overtime work, the employers would sometimes allow off-the-clock work with "miscellaneous pay."

> "Q. And so why would you make them not work the shift? A. Because of the overtime pay. It's just—it's almost an industry standard in not letting servers work their overtime pay. Q. Yeah. But you're letting them work. You're not just not letting the hours accrue. A. That's correct. Q. And that makes it better to you? That makes it legal to you? A. I don't know. I'm not a lawyer. That's just between the server and the … supervisor."

(Doc. 26-1 at 11–12).

When the employees worked for "miscellaneous pay," the employers paid them just $5.00 plus tips. (Doc. 26-1 at 10). This "miscellaneous pay" was $0.78 short of the required $5.78 overtime wage. So, every hour of "miscellaneous pay" worked in lieu of overtime was a FLSA violation. As discussed in the previous section, the employees could have earned hundreds of dollars in tips, but the employers would still commit a FLSA violation by failing to pay the base wage. *See P&K Rest. Enter., LLC*, 758 F. App'x at 848; 29 U.S.C. § 203(m); 29 C.F.R. § 516.28(a)(3). So, the employers' sole objection that the employees did not track their cash tips is irrelevant. Summary judgment is due to be granted on this issue as well.

## CONCLUSION

Based on the above reasoning, Plaintiffs' Motion for Partial Summary Judgment is **GRANTED**.

**DONE** and **ORDERED** this 5th day of August 2019.

                                            /s/ Andrew L. Brasher
                                  ANDREW L. BRASHER
                                  UNITED STATES DISTRICT JUDGE